# 15-1823

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
_____

DONAHUE FRANCIS,
*Plaintiff-Appellant,*

v.

KINGS PARK MANOR, INC., and CORRINE DOWNING,
*Defendants-Appellees*,

and

RAYMOND ENDRES,
*Defendant.*
_____

On Appeal from the United States District Court
For the Eastern District of New York, No. 2:14-cv-03555-ADS-GRB
The Honorable Arthur D. Spatt, District Judge, Presiding

### REPLY BRIEF OF PLAINTIFF-APPELLANT

Sasha Samberg-Champion
John P. Relman
Yiyang Wu
RELMAN, DANE & COLFAX PLLC
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ..................................................................................... 1

ARGUMENT ........................................................................................... 5

I.    The Fair Housing Act Requires a Landlord to Take Reasonable Measures to Address the Harassment of a Tenant Based on Race or Other Protected Class ............................ 5

    A. The Fair Housing Act Imposes Responsibilities on Housing Providers Comparable to Those That Title VII Imposes on Employers. ............................................................. 5

    B. KPM's Argument for Distinguishing Title VII and the FHA Misunderstands Title VII Law, Under Which Employers Must Remedy Hostile Workplace Environments Not Created by Their Agents. ............................ 11

    C. KPM's Policy Arguments Are Directed to the Wrong Forum, and in Any Event They Are Meritless. ........................ 14

II.    Mr. Francis Properly Pleaded a Claim of Negligent Failure to Address a Discriminatory and Hostile Housing Environment .................................................................. 20

    A. The harassment was "because of race." .................................. 21

    B. The harassment was sufficiently severe. ................................. 23

    C. KPM had sufficient knowledge to trigger its duty to act. ........ 25

CONCLUSION ........................................................................................ 28

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7) ..................... 29

CERTIFICATE OF SERVICE .................................................................. 30

i

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Bloch v. Frischholz*,
    587 F.3d 771 (7th Cir. 2009) ............................................................ 10

*City of Edmonds v. Oxford House, Inc.*,
    514 U.S. 725 (1995)........................................................................... 6

*City of N.Y. v. Permanent Mission of India to the United Nations*,
    446 F.3d 365 (2d Cir. 2006) ............................................................. 6

*Cohen v. JP Morgan Chase & Co.*,
    498 F.3d 111 (2d Cir. 2007) ..........................................................7-8

*Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*,
    576 U.S. ___, 135 S. Ct. 2507 (2015) ........................................... 2, 7

*Duch v. Jakubek*,
    588 F.3d 757 (2d Cir. 2009) ........................................................... 27

*Ellison v. Brady*,
    924 F.2d 872 (9th Cir. 1991) .......................................................... 23

*Fahnbulleh v. GFZ Realty, LLC*,
    795 F. Supp. 2d 360 (D. Md. 2011)................................................. 15

*Gant ex rel. Gant v. Wallingford Bd. of Educ.*,
    195 F.3d 134 (2d Cir. 1999) ........................................................... 13

*Halprin v. Prairie Homes of Dearborn Park*,
    388 F.3d 327 (7th Cir. 2004) .......................................................... 10

*Hrobowski v. Worthington Steel Co.*,
    358 F.3d 473 (7th Cir. 2004) .......................................................... 24

*Huntington Branch, NAACP v. Town of Huntington*,
    844 F.2d 926 (2d Cir. 1988) ............................................................. 6

*Kabbani v. Council House, Inc.*,
    406 F. Supp. 2d 1189 (W.D. Wash. 2005) ...................................... 19

*Meritor Sav. Bank v. Vinson*, *FSB*,
    477 U.S. 57 (1986).............................................................................. 2

*Meyer v. Holley*,
    537 U.S. 280 (2003)........................................................................ 7

*Neudecker v. Boisclair Corp.*,
    351 F.3d 361 (8th Cir. 2003) ............................................. 15

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998)................................................................. 2, 22

*Pryor v. United Air Lines, Inc.*,
    791 F.3d 488 (4th Cir. 2015) ............................................. 24

*Ragin v. New York Times Co.*,
    923 F.2d 995 (2d Cir. 1991) ............................................ 7, 19

*Reeves v. Carrollsburg Condo. Unit Owners Ass'n*,
    No. 96-cv-2495, 1997 WL 1877201 (D.D.C. Dec. 18, 1997)...... 15, 18

*Smiley v. Citibank (S.D.), N.A.*,
    517 U.S. 735 (1996)................................................................ 3, 8

*Town of Huntington, N.Y. v. Huntington Branch, NAACP*,
    488 U.S. 15 (1988)................................................................... 6

*United States v. Avatar Props., Inc.*,
    No. 14-cv-502-LM, 2015 WL 2130540 (D.N.H. May 7, 2015) ........ 11

*United States v. Gayle*,
    342 F.3d 89 (2d Cir. 2003) .............................................. 5-6

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)................................................................ 9

*United States v. Space Hunters, Inc.*,
    429 F.3d 416 (2d Cir. 2005) .............................................6-7, 19, 20

*United States v. Weisz*,
    914 F. Supp. 1050 (S.D.N.Y. 1996) ................................... 22

*Viens v. America Empire Surplus Lines Ins. Co.*,
    --- F. Supp. 3d ---, No. 3:14cv952 (JBA), 2015 WL 3875013
    (D. Conn. June 23, 2015)................................................... 11

iii

*Williams v. Poretsky Mgmt., Inc.*,
    955 F. Supp. 490 (D. Md. 1996) .......................................................... 15


**Statutes, Rules & Other Authorities**          **Page(s)**

42 U.S.C. § 1981 ............................................................................. 13

42 U.S.C. § 3604(b) ......................................................................... 2

Jake Blumgart, <u>Landlords Have An Edge In Eviction Cases.</u>
    <u>They Can Afford Lawyers, and Low-Income Renters Can't</u>,
    *Slate* (Dec. 8, 2015), available at
    http://www.slate.com/blogs/moneybox/2015/12/08/
    baltimore_renters_are_losing_their_eviction_cases_
    because_they_can_t_afford.html ................................................... 17-18

Matthew Desmond, *Unaffordable America: Poverty,*
    *Housing, and Eviction* 3 (March 2015), available at
    http://www.irp.wisc.edu/publications/fastfocus/
    pdfs/FF22-2015.pdf ............................................................................ 17

HUD, *Quid Pro Quo and Hostile Environment Harassment and*
    *Liability for Discriminatory Housing Practices Under the*
    *Fair Housing Act*, 80 Fed. Reg. 63,720 (proposed Oct. 21, 2015)
    (to be codified at 24 C.F.R. pt. 100) ........................................ 8, 15, 25

HUD No. 15-127, Wisconsin Landlords Charged With Housing
    Discrimination After Claims They Allowed Harassment Of
    Tenants With Disabilities (Oct. 14, 2015), available at
    http://portal.hud.gov/hudportal/HUD?src=/press/
    press_releases_media_advisories/2015/HUDNo_15-127 ................... 9

Robert G. Schwemm, *Cox, Halprin and Discriminatory*
    *Municipal Services Under The Fair Housing Act*,
    41 Ind. L. Rev. 717 (2008) ................................................................ 11

**INTRODUCTION**

The Fair Housing Act, like Title VII of the Civil Rights Act of 1964, requires those regulated by it to take reasonable steps to remedy discriminatory environments that are under their control. In his opening brief, Mr. Francis explained why this conclusion is compelled by, among other things, the FHA's plain text and its authoritative construction by the federal agency charged with administering it. He also explained how his Complaint states a claim that KPM violated the FHA. Mr. Francis was subjected to months of egregious racial harassment by a fellow tenant, including repeated physical threats and use of the word "nigger"; KPM was repeatedly informed of this behavior, and intentionally chose to do nothing. KPM would violate Title VII if it tolerated such an abusive environment for its employees. It violated the FHA by allowing its tenant to be subjected to such abuse.

KPM refutes none of these points. Instead, it invites this Court to construe the FHA narrowly based on policy arguments that, in addition to being better directed to Congress or to the Department of Housing and Urban Development, are mistaken. Meanwhile, its argument that Mr. Francis failed to state a claim consists almost entirely of entreaties for this Court to consider "facts" not in the Complaint and draw inferences against the non-moving party.

1

Construction of the FHA can begin and end with the statute's plain language. The FHA makes it unlawful for a housing provider to "discriminate against" an individual "in the terms, conditions, or privileges" of housing "because of" the individual's race. 42 U.S.C. § 3604(b). Precisely the same operative language appears in Title VII, pursuant to which an employer "discriminate[s] . . . in the terms, conditions, privileges" of employment when it negligently fails to remedy a discriminatory workplace environment. *Meritor Sav. Bank v. Vinson, FSB*, 477 U.S. 57, 64 (1986). A housing provider similarly "discriminate[s]" by negligently failing to remedy a discriminatory housing environment.

KPM simply ignores the FHA's operative language other than to assert, incorrectly, that discrimination is only "because of" race if the person being sued has discriminatory intent. This argument cannot be squared with Title VII hostile environment precedent, *see, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), or with FHA precedent holding that discriminatory intent is not required. *See Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. ___, 135 S. Ct. 2507, 2519 (2015).

In light of the FHA's and Title VII's complementary purposes, it is well settled that the statutes should be construed to offer comparable protections in their respective spheres. Accordingly, all three courts of appeals to consider the question have, correctly, construed a landlord's obligation to remedy a hostile

2

housing environment under the FHA to be consistent with an employer's obligation to remedy a hostile work environment under Title VII. KPM argues that those cases addressed different factual scenarios, but that is beside the point.

HUD, meanwhile, has consistently construed "discrimination" under the FHA to include a housing provider's failure to take reasonable steps to remedy a discriminatory housing environment. KPM does not challenge the reasonableness of this authoritative agency interpretation. It simply protests that the rule HUD now has proposed to formalize this interpretation had not been issued before the events alleged in the Complaint. That, too, is irrelevant. *See Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 741 (1996).

Notwithstanding HUD's view to the contrary, KPM asserts that the housing environment is so fundamentally different from the work environment that similar protections should not apply. In particular, it repeatedly asserts (though offering no evidence in support) that housing providers have insufficient control over their tenants to remedy discriminatory housing environments. That is not a question of law at all, but a question of fact to be resolved case-by-case. KPM also asserts, incorrectly, that *Meritor* and its Title VII progeny require employers to remedy only discrimination caused by their agents. In his opening brief, Mr. Francis demonstrated the error of this premise, on which the District Court's opinion largely was based. KPM ignores Mr. Francis's argument.

3

KPM devotes much of its brief to policy considerations that are better directed to Congress or HUD, and in any event are meritless. It asserts that giving the FHA its most natural reading somehow will have dire effects, including the eviction of numerous innocent tenants. KPM offers no reason to think its imagined parade of horribles will suddenly materialize if this Court gives the FHA the same straightforward reading that HUD and many courts have given it for years. Its arguments appear to be based on an exaggerated understanding of the limited (though important) obligation at issue. The FHA requires housing providers only to take reasonable steps in response to discriminatory environments about which they are (or should be) aware. They need not take any unreasonable actions of any kind.

In his opening brief, Mr. Francis also explained how his Complaint pleaded all three elements of a hostile environment claim. Specifically, Mr. Francis explained how, based on the Complaint's allegations, (1) he suffered harassment based on his race; (2) that harassment was sufficiently pervasive and severe as to create a hostile housing environment; (3) and KPM knew or should have known of the harassment but failed to take reasonable steps to remedy it.

In response, KPM does not explain how the Complaint's allegations, taken as true with all inferences given to the plaintiff, fail to meet any of these three elements. Instead, it contests the Complaint's allegations, relies heavily on its own

4

"facts" that appear nowhere in the Complaint, and suggests that this Court draw inferences in its favor, all in contravention of established rules for adjudicating motions to dismiss for failure to state a claim.

To the limited extent that KPM engages with Mr. Francis's actual allegations, its arguments are based on a misunderstanding of the law governing the claims here. For example, KPM repeatedly argues that Mr. Endres could have had reason to harass Mr. Francis apart from race. Even if that were true (and it would be improper to so find in this procedural posture), it would be irrelevant to the claims here, which are not brought against Mr. Endres and so do not require a determination as to who started the conflict or why he did so. All that matters here is that race contributed to the hostile environment that Mr. Endres inflicted upon Mr. Francis and that KPM did nothing to remedy.

For all the reasons stated in Mr. Francis's opening brief, as well as below, this Court should reverse.

## ARGUMENT

## I. The Fair Housing Act Requires a Landlord to Take Reasonable Measures to Address The Harassment of a Tenant Based on Race or Other Protected Class

### A. *The Fair Housing Act Imposes Responsibilities on Housing Providers Comparable to Those That Title VII Imposes on Employers.*

"Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well." *United States v. Gayle*, 342 F.3d 89,

92 (2d Cir. 2003); *accord City of N.Y. v. Permanent Mission of India to the United Nations*, 446 F.3d 365, 369-70 (2d Cir. 2006). Here, as Francis has explained, the Fair Housing Act has the same broad operative language – barring discrimination in the "terms, conditions, or privileges" of housing – that the Supreme Court has construed to create Title VII's obligation for an employer to remedy a known discriminatory working environment. Opening Br. at 14-16. That the two statutes have the same operative language is not a coincidence; they "are part of a coordinated scheme of federal civil rights laws enacted to end discrimination." *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir. 1988), *aff'd*, 488 U.S. 15 (1988); *see* Opening Br. at 16 (citing more cases for the statutes' common purposes).

Accordingly, where the Supreme Court has construed Title VII to require an employer to take reasonable measures to ensure a non-discriminatory working environment, this Court's presumption should be that the same language in the FHA requires housing providers to take comparable measures. Moreover, in recognition of the FHA's intended breadth, *see City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) (recognizing FHA's "broad and inclusive compass") (citation omitted), this Court consistently has construed the FHA's protections to extend as far as the statute's text can support. *See, e.g.*, *United*

*States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005); *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991).

KPM offers no alternative reading of the FHA's "terms, conditions, or privileges" language, which it entirely ignores. Instead, observing that the FHA bars discrimination "because of" race or other protected class, KPM argues that this somehow defeats Mr. Francis's claim. *See* KPM Br. at 18, 35-36. But Title VII, too, bans discrimination "because of" protected class; KPM does not explain why the same language should be construed differently under the FHA. As explained further in Point II.A, *infra*, the Complaint alleges that the hostile environment that KPM failed to take reasonable steps to remedy was "because of" race as that phrase is used in Title VII caselaw. To the extent that KPM means to argue that an FHA claim can be brought only against one who intentionally discriminates, the Supreme Court has rejected that argument. *Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. ___, 135 S. Ct. 2507, 2519 (2015).

The FHA's text thus speaks clearly to this question. And while there is no reason to go further, any ambiguity that might exist should be resolved in favor of HUD's reasonable interpretation. *See, e.g.*, *Meyer v. Holley*, 537 U.S. 280, 287-88 (2003) (deferring to HUD's views as to extent of vicarious liability for another's bad acts under the FHA); *see also Cohen v. JP Morgan Chase & Co.*, 498 F.3d

111, 113, 125 (2d Cir. 2007) (deferring to HUD's interpretation of ambiguous statutory provision).

As Mr. Francis explained in his opening brief, HUD has consistently construed the FHA to require housing providers to take reasonable measures in response to a discriminatory housing environment. Opening Br. at 18-19. Since Mr. Francis filed his opening brief, HUD has (as expected) issued a proposed rule that will formalize and provide additional detail regarding this long-held view through the notice and comment process. HUD, *Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act*, 80 Fed. Reg. 63,720 (proposed Oct. 21, 2015) (to be codified at 24 C.F.R. pt. 100). HUD's interpretation will receive full *Chevron* deference as soon as the agency issues its final rule. Contrary to KPM's suggestion, *see* KPM Br. at 44, a promulgated interpretation receives such deference even as applied to events occurring before its promulgation. *See Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 741 (1996).

Because HUD's interpretation likely will be promulgated soon,[1] this Court need not decide what level of deference to give HUD's views absent that rule. But HUD has "long recognized" the interpretation of the FHA that it published in the proposed rule. *See* 80 Fed. Reg. 63,720. Not only did HUD express that view in a

---

[1] The comment period for the proposed rule has closed.

prior proposed rulemaking, but it takes enforcement actions consistent with this interpretation. For example, this October, HUD brought a charge against a landlord that failed to stop tenants from harassing neighbors who had cerebral palsy and Down's syndrome. *See* HUD No. 15-127, *Wisconsin Landlords Charged With Housing Discrimination After Claims They Allowed Harassment Of Tenants With Disabilities* (Oct. 14, 2015), available at http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/ 2015/HUDNo_15-127.[2]

Consistent with the discussion above, every court of appeals case to consider the question has concluded that landlord liability for a "hostile housing environment" should be guided by long-standing precedent regarding employer liability for hostile work environments under Title VII. *See* Opening Br. at 17. Adoption of Francis's position here would fully align this Circuit with three others; adoption of KPM's position – which requires a holding that much of the Title VII framework does not apply to the FHA – would not. KPM does not (and cannot) argue to the contrary. It merely argues that the facts of this case are different, which is true but beside the point. *See* KPM Br. at 26-27.

---

[2] Such adjudicative actions may already warrant *Chevron* deference, *see United States v. Mead Corp.*, 533 U.S. 218, 230 & n.12 (2001) (listing "formal adjudication" among category of agency actions that receive *Chevron* deference along with "the fruits of notice-and-comment rulemaking").

KPM also argues that the FHA bars only discrimination in the initial rental transaction and does nothing to address discrimination that occurs thereafter. *See* KPM Br. at 16-17. Once again, this argument cannot be squared with the Supreme Court's treatment of identical language in Title VII, which "protects the job holder as well as the job applicant." *Halprin v. Prairie Homes of Dearborn Park*, 388 F.3d 327, 329 (7th Cir. 2004). *Halprin* did not explain why the FHA's identical language should not similarly protect one who resides in housing as well as one who is applying for it; instead, it improperly narrowed the reach of the FHA's broad text to those fact patterns discussed in its legislative history. *Id.*

*Halprin* was wrongly decided, and it has not been followed, even by the Seventh Circuit. In *Bloch v. Frischholz*, 587 F.3d 771 (7th Cir. 2009) (en banc), the Seventh Circuit correctly recognized that the FHA's plain language mirrors Title VII's and thus is best read to reach post-acquisition conduct. *Id.* at 779. It also deferred to HUD's regulations, which explicitly cover post-acquisition conduct. *Id.* at 780. Following *Bloch*, the prevailing view has been that the FHA's protections do not end after housing is acquired. *See* Opening Br. at 22-23 n.12. KPM does not cite a single post-*Bloch* case that supports its position. Nor does it offer any reason for this Court to construe the FHA inconsistently with its statutory text, with HUD's regulations, and with the FHA's broad purposes. Indeed, KPM appears to shy away from the unfortunate implications of its own argument,

10

conceding that a landlord should be liable under the FHA where the landlord itself

harasses a tenant. KPM Br. at 34-35.[3]

B. *KPM's Argument for Distinguishing Title VII and the FHA Misunderstands Title VII Law, Under Which Employers Must Remedy Hostile Workplace Environments Not Created by Their Agents.*

In his opening brief, Mr. Francis explained at length that much of the

District Court's reasoning was based on a fundamental misunderstanding of well-

established Title VII doctrine, which the District Court mistakenly believed it was

faithfully applying to the FHA. Under Title VII, an employer is vicariously

responsible for the wrong-doing of its agents. It *also* is responsible for its own

negligent failure to remedy a discriminatory and hostile workplace environment,

regardless of whether that environment is caused by its own agent. Thus, that

tenants are not landlords' agents does not mean a landlord can turn a blind eye to

their conduct with impunity, as the District Court incorrectly reasoned; a landlord

(like an employer) is responsible for its own negligent failure to remedy

discrimination in the environment that it controls. That does not mean the landlord

---

[3] For more comprehensive discussion of the subject, in addition to the authorities cited in Mr. Francis's opening brief, *see generally* Robert G. Schwemm, *Cox, Halprin and Discriminatory Municipal Services Under The Fair Housing Act*, 41 Ind. L. Rev. 717 (2008) (examining at length why FHA's text, legislative history, broad purpose, and consistent administrative construction require that the statute be construed to ban discrimination post-acquisition); *see also Viens v. America Empire Surplus Lines Ins. Co.*, --- F. Supp. 3d ---, No. 3:14cv952 (JBA), 2015 WL 3875013, at *8-*10 (D. Conn. June 23, 2015); *United States v. Avatar Props., Inc.*, No. 14-cv-502-LM, 2015 WL 2130540, at *3 (D.N.H. May 7, 2015).

is being held responsible for its tenants' actions. Rather, it can be liable under the FHA for its *own* failure to take reasonable action. *See* Opening Br. at 23-31.

KPM ignores this argument, too. It continues to simply assert, wrongly, that Title VII liability depends on an agency relationship between the employer and a harassing employee. *See, e.g.*, KPM Br. at 22 ("an employer's negligence liability is based upon agency law"). Oddly, it offers an unexplained string citation of Title VII cases in which, contrary to KPM's own argument, employers were held responsible for failing to remedy discriminatory work environments created by non-agents. *See* KPM Br. at 20-21 n.2. KPM highlights that in each case it was an employee who *suffered* harassment; that is because Title VII protects only employees, just as the FHA protects only those exercising their housing rights.

Relatedly, KPM argues at length that landlords have insufficient control over their tenants to be held responsible for failing to stop harassing behavior. *See, e.g.*, KPM Br. at 21 ("Landlords simply do not have the same control and access over tenants that employers have over employees."). But that is simply an assertion of fact that contradicts the Complaint and, ultimately, can be accounted for within the well-established negligence standard. If KPM lacked the ability to stop Mr. Endres's harassment of Mr. Francis, it will face no liability. The same is true for landlords more generally; they will only be held liable for the actions they could reasonably have taken and for the knowledge for which they can reasonably be

12

charged.  For now, however, this Court must take as true the Complaint's allegation that KPM had the ability and knowledge to act but did not.[4]  *See, e.g.*, J.A. 19-20 ¶¶ 61, 63; 50 ¶ 6 (KPM could have taken action against Mr. Endres); J.A. 9 ¶ 6; 13-14 ¶¶ 25, 32 (KPM knew of the discriminatory environment Mr. Endres created).

At the end of the day, KPM fails to acknowledge, let alone justify, the anomalous rule it proffers.  KPM appears to accept that it would be liable to its *employee* under Title VII if Mr. Endres harassed her and KPM did nothing about it. *See* KPM Br. at 20-21 n.2.  Yet it asserts that it is not liable to its *tenant* under the FHA for failure to stop the same person from engaging in the same behavior – even though the operative text of the two statutes is precisely the same, and even though the agency charged with administering the FHA construes that statute to provide protection equivalent to Title VII's.

---

[4] For similar reasons, there is no basis for KPM's argument that, as a matter of law, a landlord cannot be subject to a claim of deliberate indifference to racial discrimination under 42 U.S.C. § 1981.  *See* KPM Br. at 14.  As KPM acknowledges, this Court has squarely held that school officials can be liable for deliberate indifference to student-on-student racial harassment under Section 981. *See Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 140-41 (2d Cir. 1999).  There is no principled reason why the same standard should not apply where a landlord refuses to remedy similar harassment.  Any factual differences between the school setting and the housing setting are properly accounted for within the deliberate indifference standard, not by fashioning a different legal rule.

### C. KPM's Policy Arguments Are Directed to the Wrong Forum, and in Any Event They Are Meritless.

Much of KPM's brief argues that it is bad policy for landlords to be liable for their negligent failure to remedy discriminatory and hostile housing environments. Such arguments should be directed to Congress, which enacted the FHA using the same operative language as Title VII and can always amend it. Better yet, they can be directed at HUD, which right now is considering how claims of this type should be adjudicated, and so presumably would be receptive to KPM's arguments. There is no reason for this Court to give the FHA anything other than its most natural reading in accordance with the usual tools of statutory interpretation. In any event, KPM offers no empirical support for its hyperbolic claims.

As an initial matter, KPM's arguments are based on two false premises, both of which appear throughout its briefing.

<u>First</u>, KPM repeatedly suggests that Mr. Francis asks this Court to create a surprising new obligation for landlords, such that landlords can be expected to dramatically change their behavior in response to this Court's ruling. *See*, *e.g.*, KPM Br. at 52 (arguing that landlords will begin evicting tenants in response to any complaint). That is not so.

As KPM does not contest, state law also requires landlords to take reasonable steps to address conditions that seriously diminish the habitability of

14

their properties, including the behavior of fellow tenants.[5]  *See* AARP Br. at 17-23;

Opening Br. at 20 & n.11.  The FHA requires little more, other than requiring

landlords to take seriously their obligation to remedy *discriminatory* housing

conditions in particular.

Nor should it be a surprise that the FHA should be so construed.  Federal

courts have many times found that the FHA requires a housing provider to take

reasonable actions to remedy a discriminatory housing environment caused by a

third party such as a fellow tenant.  *See, e.g.*, *Neudecker v. Boisclair Corp.*, 351

F.3d 361, 364-65 (8th Cir. 2003); *Fahnbulleh v. GFZ Realty, LLC*, 795 F. Supp. 2d

360, 364 (D. Md. 2011); *Reeves v. Carrollsburg Condo. Unit Owners Ass'n*, No.

96-cv-2495, 1997 WL 1877201, at \*7 (D.D.C. Dec. 18, 1997); *Williams v.

Poretsky Mgmt., Inc.*, 955 F. Supp. 490, 496-97 (D. Md. 1996).  HUD, too, has

"long recognized" such claims.  *See Quid Pro Quo and Hostile Environment*

*Harassment and Liability for Discriminatory Housing Practices Under the Fair*

---

[5] Far from contesting this, KPM also contends – in serious (though unacknowledged) tension with its argument that Mr. Francis seeks to impose on it a new obligation – that application of the FHA to fact patterns like this one is "unnecessary because adequate remedies are available to tenants" pursuant to state law.  KPM Br. at 6-7.  Taken seriously, KPM's logic suggests the FHA itself is largely unnecessary, since some state law often is violated by conduct that violates the FHA.  In reality, the FHA remains a critical remedy for ensuring non-discrimination in housing, as the facts of this case demonstrate.  The state-law remedies on which KPM would have Mr. Francis rely too often are insufficient to ensure landlord compliance.

*Housing Act*, 80 Fed. Reg. at 63,720. Accordingly, and contrary to KPM's contentions, HUD found that its proposed rule "adds no additional costs to housing providers and others engaged in housing transactions." *Id.*

What *would* constitute a surprising change in the law is the declaration KPM seeks: that the FHA imposes absolutely no obligation on landlords to remedy discriminatory harassment, even where the landlord knows of that harassment and has the ability to remedy it.

<u>Second</u>, KPM's policy arguments appear to be based on a misunderstanding of the breadth of the legal rule at issue. Mr. Francis does not contend that the FHA should be "a vehicle for the resolution of neighborhood disputes," KPM Br. at 6, any more than Title VII governs all workplace disputes, or that a landlord must guarantee "a housing unit free of any unwelcome or invidious conduct by others," *id.* at 29. Rather, the FHA governs a landlord's obligations only with respect to *discriminatory* conduct, and only such conduct that (1) is sufficiently egregious as to effectively change the terms and conditions of housing and (2) the landlord can reasonably know about and remedy.

Thus, KPM argues against a straw man in asserting that the FHA should not "serve as a means for neighbors of different races to bring neighborhood feuds into court when such feuds have little or no actual relation to housing discrimination." *Id.* at 19. Mr. Francis does not contend otherwise. Similarly, KPM suggests

16

throughout that Mr. Francis (and, presumably, HUD) would require KPM and other landlords to take unreasonable actions or would impose liability for discriminatory environments about which landlords could not have known. To the contrary: Mr. Francis argues only that landlords have the duty to act reasonably in response to egregious discriminatory conduct about which they knew or should have known. The duty to take reasonable action would not, for example, require a landlord to incur so much expense as to make the provision of housing impossible. KPM Br. at 56.

KPM's policy arguments do not require extended further response, but a couple of points merit some clarification.

KPM exaggerates the difficulty for landlords in taking action against problem tenants (or, for that matter, those who pose no problem at all). It argues that a landlord has no remedy other than eviction, and that such a remedy requires burdensome "judicial intervention." KPM Br. at 7-8, 25. In reality, landlords have little difficulty removing low-income tenants who receive Section 8 vouchers; they do so with regularity, whether rightly or wrongly.[6] Moreover, as explained in

---

[6] For further discussion, *see, e.g.*, Matthew Desmond, *Unaffordable America: Poverty, Housing, and Eviction* 3 (March 2015) (describing one Milwaukee study finding that one in 14 rental households in that city are evicted annually, and another finding that even more displacement occurs through informal evictions), available at http://www.irp.wisc.edu/publications/fastfocus/pdfs/FF22-2015.pdf; Jake Blumgart, Landlords Have An Edge In Eviction Cases. They Can Afford Lawyers, and Low-Income Renters Can't, *Slate* (Dec. 8, 2015) (summarizing

greater detail in AARP's amicus brief, landlords that actually attempt to remedy discriminatory environments (as opposed to imagining reasons why it is impossible to do so) have a variety of tools at their disposal besides eviction. *See* AARP Br. at 17-23. KPM acknowledges that it has the authority to, for example, transfer tenants to different apartments to end a conflict. KPM Br. at 54.

Indeed, while the facts of this case suggest eviction as the most natural remedy,[7] that is not so in other cases. The FHA's requirement to take reasonable action to remedy a discriminatory housing environment applies even to entities that lack the authority to evict. For example, a condominium association must take reasonable steps to stop its members' discriminatory harassment of a neighbor; such steps could include "cease and desist requests, fines, hearings, and suspension or revocation of the right to use common facilities." *See Reeves*, 1997 WL 1887201, at *8 .

---

studies showing power imbalance between renters and landlords, such that landlords nearly always prevail in eviction proceedings no matter what the case's merits), available at http://www.slate.com/blogs/moneybox/2015/12/08/baltimore_renters_are_losing_their_eviction_cases_because_they_can_t_afford.html.

[7] As KPM observes, some tenants are so problematic that it would be unreasonable to inflict them on other neighbors. KPM Br. at 54. Eviction presumably would be appropriate under such circumstances, and KPM itself presumably believed Mr. Endres was such a tenant, since it declined to renew his lease.

KPM also misses the mark in arguing at length that landlords will violate due process, suppress the protected speech of tenants, and increase homelessness among low-income people if they are required to take reasonable steps to redress known harassment that creates a discriminatory and hostile environment. *See* KPM Br. at 9-10, 45-58. In reality, the greater threat is that families are driven into homelessness – as, unfortunately, happens with regularity – because landlords tolerate harassing and discriminatory behavior. Any reasonable action landlords take to combat such harassment will, by definition, be directed not at speech but rather at conduct; whatever speech goes along with that conduct will be sufficiently discriminatory as to receive little First Amendment protection.[8] *Cf. Space Hunters*, 429 F.3d at 425 (rejecting argument that, because of First Amendment concerns, FHA's bar on discriminatory statements should be read narrowly); *Ragin*, 923 F.2d at 1002-04 (same). Landlords should, of course, take any remedial action that proves necessary consistent with tenants' rights, including their rights under the Constitution and applicable HUD regulations.[9]

---

[8] KPM argues that landlords will be unable to discern what speech is constitutionally protected. See KPM Br. at 47-49. But the FHA does not require them to make any such constitutional determination; it merely requires them to act reasonably to prevent a hostile environment on their premises.

[9] The discussion in the text assumes the validity of KPM's assertion that KPM – a private entity – even *can* violate tenants' constitutional rights in the way that KPM imagines. *But see Kabbani v. Council House, Inc.*, 406 F. Supp. 2d 1189, 1194-95 (W.D. Wash. 2005) (landlord not state actor and thus did not violate First

19

## II.     Mr. Francis Properly Pleaded a Claim of Negligent Failure to Address a Discriminatory and Hostile Housing Environment

In his opening brief, Mr. Francis explained how his Complaint pleaded all three elements of a hostile environment claim:  (1) he suffered harassment based on his race; (2) that harassment was sufficiently pervasive and severe as to create a hostile housing environment; (3) and KPM knew or should have known of the harassment but failed to take reasonable steps to remedy it.  *See* Opening Br. at 31-39.  KPM does not explain how the Complaint's allegations, taken as true with all inferences given to the plaintiff, fail to meet any of these three elements.  Instead, it presents an alternative factual account that departs from the Complaint's allegations, adds new "facts," and draws inferences unfriendly to the plaintiff.  None of this is proper on this Court's review of a decision granting a motion to dismiss for failure to state a claim.  *See, e.g.*, *United States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005).

For example, KPM simply asserts (with no attempt to explain how these "facts" are consistent with a proper reading of the Complaint that includes all reasonable inferences given to the plaintiff): that Mr. Francis was the one at fault because he bothered Mr. Endres, *see* KPM Br. at 1, 38; that the harassment Mr. Francis suffered was not "because of" race (despite the repeated use of the word

---

Amendment when imposing "house rules" that allegedly restricted tenants' speech).  This Court need not decide that question.

"nigger"), *id.* at 2; and that "KPM and Downing had no reason to believe their intervention was required," *id.* at 3. KPM also repeatedly argues that Mr. Francis has not put forward evidence to support his allegations. *See, e.g.*, KPM Br. at 1 (Complaint fails to include Mr. Francis's own statements); *id.* at 2 ("Francis's allegations are uncorroborated by any witness statements."). It is, of course, not Mr. Francis's obligation to plead evidence.

Because KPM presents no argument that is consistent with the rules governing this procedural posture, this Court can stop right there. To the extent that KPM's arguments can be construed to apply to the Complaint's actual allegations, they merit only short discussion beyond the points made in Mr. Francis's opening brief.

### A. *The harassment was "because of race."*

KPM argues that the harassment that Mr. Francis endured was not "because of race." Its argument, apparently, is that Mr. Endres had other reasons for harassing Mr. Francis besides race. *See* KPM Br. at 38-39.

Adopting KPM's view of the facts would require this Court to improperly draw inferences adverse to the plaintiff. The Complaint need not be read, and indeed is not naturally read, to suggest that Mr. Francis did anything to invite Mr. Endres's harassment. Even assuming such a showing would affect KPM's

21

obligation to act (and KPM does not explain how it could[10]), there is no basis for accepting that version of the facts alleged on review of a motion to dismiss.

More fundamentally, KPM relies on a cramped and incorrect view of how a housing environment can be hostile "because of" a protected classification. The question for this claim, which is not against Mr. Endres, is not whether Mr. Endres disliked Mr. Francis because of race. The question, rather, is whether race contributed to the hostile environment that Mr. Endres inflicted upon Mr. Francis. It did.

Mr. Endres repeatedly called Mr. Francis "nigger," the most racially charged epithet possible. This harassment would not have occurred had Mr. Francis been white, and it creates an environment that is hostile "because of" race. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (treatment is "because of" sex when "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed") (internal citation and quotation marks omitted).

KPM erroneously relies upon *United States v. Weisz*, 914 F. Supp. 1050 (S.D.N.Y. 1996), in which one neighbor sued another for harassing behavior and

---

[10] A reasonable landlord could possibly take such context into account in deciding how to remedy a discriminatory housing environment. Here, there is no indication that KPM did so, or indeed that it knew anything about the relationship between Mr. Endres and Mr. Francis other than what was reported by Mr. Francis and the police.

22

the district court concluded that the harassment was not motivated by religion. *See* KPM Br. at 38. This is not a case against Mr. Endres, such that his subjective motivations are at issue. Rather, this is a case against those in charge of the housing environment for permitting an environment that is objectively hostile because of race, regardless of the motivations of the one who created that hostility. *See, e.g.*, *Ellison v. Brady*, 924 F.2d 872, 878-880 (9th Cir. 1991) (fellow employee created environment that discriminated because of sex such that employer had obligation to remedy it, regardless of whether that employee intended his behavior to create such an environment).

        B. *The harassment was sufficiently severe.*

    As Mr. Francis explained in his opening brief, Mr. Endres's prolonged campaign of harassment – including the repeated and threatening use of the word "nigger" – could readily be found sufficiently severe and/or pervasive to create a hostile environment. *See* Opening Br. at 32-35.

    KPM disputes this only half-heartedly, offering little to support its position. It notes that Mr. Endres did not literally bar Mr. Francis from entering his apartment, *see* KPM Br. at 38, but such an extreme showing is not required for racial harassment to implicate the FHA's protections, just as a Title VII hostile work environment claim need not include a showing of constructive discharge. KPM also notes that "isolated incidents" of harassment at work can be insufficient

23

to trigger an employer's duty under Title VII, without explaining the relevance to this case, where Mr. Endres's conduct far exceeded such "isolated incidents."[11] *Id.* at 37-38.

KPM offers nothing more, other than a conclusory assertion that the conduct alleged here is insufficiently severe or pervasive. In particular, KPM does not dispute that an environment in which "nigger" is regularly used in a threatening way towards an African-American tenant is objectively hostile because of race, nor would such an argument be successful. *See* Opening Br. at 34-35; *see also Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 496-97 (4th Cir. 2015) (use of the word "nigger," combined with threat of physical harm, creates hostile work environment); *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (African-American plaintiff's "repeated subjection to hearing that word" could lead reasonable jury to find workplace was objectively hostile because of race).

Accordingly, Mr. Francis has, at the very least, pleaded a plausible claim that his housing environment was made objectively hostile because of Mr. Endres's behavior. Even assuming that he must satisfy the standards developed under Title VII caselaw, he does so easily. This Court should be aware, however,

---

[11] It appears that the true purpose of this "argument" is for KPM to note that Mr. Francis once lost a lawsuit.

that HUD's proposed rule cautions that the workplace and the home are sufficiently different environments that Title VII jurisprudence regarding what harassment is severe enough to create a hostile work environment may not always be applicable under the FHA. In particular, HUD states:

> One's home is a place of privacy, security, and refuge (or should be), and harassment that occurs in or around one's home can be far more intrusive, violative, and threatening than harassment in the more public environment of one's work place.

HUD, *Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act*, 80 Fed. Reg. 63,720, 63,722 (proposed Oct. 21, 2015) (to be codified at 24 C.F.R. pt. 100). Thus, "the same or similar conduct may result in a violation of the Fair Housing Act even though it may not violate Title VII." *Id.* at 63,724. Again, the allegations of this case are of sufficiently egregious conduct that this Court need not delve into such distinctions.

### C. KPM had sufficient knowledge to trigger its duty to act.

In his opening brief, Mr. Francis explains how KPM had sufficient knowledge of the discriminatory housing environment Mr. Endres created that it was unreasonable for KPM to decline to act. Opening Br. at 35-39. KPM does not dispute that it had sufficient knowledge of the discriminatory environment, nor could it given the Complaint's allegations.

Instead, KPM argues that it would not have been reasonable for KPM to act under the circumstances described in the Complaint. It recites facts that it believes beneficial to its position without explaining their relevance as a matter of law. For example, KPM maintains that "Francis elected a path of pursuing these incidents with the Suffolk County Police Department," KPM Br. at 2. It does not explain how Francis's reporting the incidents to the police could diminish KPM's independent duties.[12]

Similarly, KPM states that Mr. Francis did not request any specific action. *Id.* at 4. Again, KPM does not explain why this would be relevant; the trigger for KPM's duty to take reasonable action was notice (or, indeed, constructive notice) that discriminatory harassment was occurring, not a request by Mr. Francis for specific relief. There can be no question that it had notice that far exceeds that required by law. *See*, *e.g.*, J.A. 13-16 ¶¶ 32-33, 38-40, 43-44 (describing Mr. Francis's three detailed letters to KPM describing the harassment he suffered). KPM's duty would have been triggered if Mr. Francis never complained to KPM at

---

[12] KPM is, of course, free to argue after discovery that it reasonably believed that the police had ameliorated the situation such that there was no longer any need to act. In doing so, it would have to explain its reasonable belief as to why Mr. Francis continued to complain to it of Mr. Endres's conduct if he did not want KPM to act.

all and KPM instead learned of the harassment from someone else.[13]  Perhaps

KPM instead means to argue that the specificity of Mr. Francis's statements is

relevant to the adequacy and reasonableness of KPM's response.  But because

KPM did nothing at all, there would be no basis in this procedural posture for a

finding that its response was reasonable.

---

[13] Unsurprisingly, KPM offers no caselaw in support of its position that it had no obligation to take any action not specifically requested.  This position is novel as well as extreme; usually, the argument by an employer or housing provider is that it did not receive sufficient notice of the hostile environment.  For example, in *Duch v. Jakubek*, 588 F.3d 757, 766-67 (2d Cir. 2009), this Court stated an employer "knew or should have known" of harassment in the Title VII context if "*someone* had actual or constructive knowledge of the harassment" and that knowledge "can be imputed to the employer."  Complaints to a supervisor can be directly imputed to the employer under this test, whereas complaints to a co-worker can be so imputed only if that co-worker can be considered a "conduit to management for complaints about work conditions."  *Id.*  Either way, it is unnecessary for the employee to make a formal complaint, and so it cannot be that the employee must request specific relief.

## CONCLUSION

This Court should reverse the judgment of the District Court and remand the

case for further proceedings.

Respectfully Submitted,

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion
John P. Relman
Yiyang Wu
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888
(202) 728-0848 (fax)
ssamberg-champion@relmanlaw.com
jrelman@relmanlaw.com
ywu@relmanlaw.com

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)

Pursuant to Rules 29(d) and 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Rule 32(a)(7)(B)(iii), this brief contains 6764 words. This certificate was prepared in reliance upon the word-count function of the word processing system (Microsoft Word 2013) used to prepare this brief. This brief complies with the typeface and type style requirements of Rule 32(a)(5) and (6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using font size 14 Times New Roman.

/s/ Sasha Samberg-Champion
Sasha Samberg-Champion
John P. Relman
Yiyang Wu
RELMAN, DANE & COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888
(202) 728-0848 (fax)
ssamberg-champion@relmanlaw.com
jrelman@relmanlaw.com
ywu@relmanlaw.com

*Attorneys for Plaintiff-Appellant*

29

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

DONAHUE FRANCIS,          )
                                   )
      Plaintiff-Appellant,     )
                                   )    **CERTIFICATE OF SERVICE**
         v.                  )     Docket Number: 15-1823
                                   )
KINGS PARK MANOR, INC., ET AL.,    )
                                   )
      Defendants-Appellees.    )
_____)

     I, Sasha Samberg-Champion, hereby certify under penalty of perjury that on January 20, 2016, the foregoing Reply Brief of Plaintiff-Appellant was electronically filed using the Court's CM/ECF system, which will send notification of such filing to the following counsel of record:

    Stanley J. Somer
    Somer & Heller, LLP

    *Attorney for Defendants-Appellees*

                           /s/ Sasha Samberg-Champion
                           Sasha Samberg-Champion